UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII, JUDGE

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )   No. 15-CR-104-AWI
                                   )
vs.                                )   SENTENCING
                                   )
KEITH FOSTER,                      )
                                   )
          Defendants.              )
_____)

Fresno, California                    Monday, November 13, 2017

REPORTER'S TRANSCRIPT OF PROCEEDINGS

KAREN HOOVEN, RMR-CRR

Official Court Reporter

CSR No. 5816

APPEARANCES OF COUNSEL:

For the Plaintiff:       United States Attorney's Office
                          BY: **MELANIE ALSWORTH**
                          and **DAWRENCE RICE**
                          2500 Tulare Street
                          Suite 4401
                          Fresno, California 93721

For the Defendant       McKneely Law Firm
Keith Foster:           BY:  **MICHAEL G. McKNEELY**
                          2300 Tulare Street
                          Suite 115
                          Fresno, California 93721

1  Monday, November 13, 2017            Fresno, California

2  10:08 a.m.

3       THE CLERK:  Court calls item number one.  15-CR-104.

4  United States versus Keith Foster.  Sentencing.

5       THE COURT:  Good morning.  If I could have your

6  appearances for the record, first on behalf of plaintiff.

7       MS. ALSWORTH:  Good morning, Your Honor, Melanie

8  Alsworth and Duce Rice appearing for the government.

9       THE COURT:  And the defense.

10      MR. McKNEELY:  Good morning, Your Honor, Mike

11  McKneely with Keith Foster.

12      THE COURT:  This is the date and time set for

13  consideration of the presentence report and for sentencing.

14  In this case, I have received and reviewed the presentence

15  report, also the formal objections filed on behalf of defense.

16  The sentencing memorandum filed on behalf of defense.  The

17  government's sentencing memorandum.

18      Let me just say at the outset.  I've benefited from

19  the very thorough presentation of all the information that

20  would be necessary for me in terms of sentencing.  The

21  presentence report, I will say -- in general they're very

22  thorough, this one is extremely thorough in that it provides

23  background.

24      The defense formal objections include literally

25  paragraph by paragraph with justification of grounds for

1  objecting to the specific provisions of individual paragraphs.

2  Sentencing memorandum for defense setting forth the background

3  information for the Court to consider under 3553(a).  And also

4  the government's sentencing memorandum that sets forth,

5  amongst other things, factual background and legal authority.

6        And I have reviewed all of that information.  And so

7  I'm prepared to, obviously, allow the parties to be heard in

8  this matter.

9        So first of all, what I'm going to do is, in terms of

10 the discussion regarding the presentence report and

11 sentencing, I'll have counsel remain at counsel table.  At the

12 time that I impose sentence, however, I will ask counsel to

13 approach the podium with Mr. Foster.

14       Okay.  So, but before I get started formally, let me

15 ask:  Are there any preliminary matters that I need to address

16 first?  On behalf of plaintiff's side?

17       MS. ALSWORTH:  No, Your Honor.

18       THE COURT:  Defense side?

19       MR. McKNEELY:  Your Honor, just a potential

20 scheduling issue.  I alerted your judicial assistant and the

21 other side that I'm in week three of a multi-defendant jury

22 trial.  We're recessed today until 1:30.  So if there's any

23 issue with that, I'd like to be able to know sooner so I can

24 let Judge Kams know.

25       THE COURT:  We'll proceed on.  If at some point in

1  time we need to take a break so we can contact the other

2  court, obviously we will take a break to do so.  But thank you

3  for letting us know.

4          THE COURT:  All right.  We'll go ahead and proceed,

5  then.  First of all, Mr. Foster, let me ask you:  Have you had

6  a chance to read over the presentence report?

7          THE DEFENDANT:  I have.

8          THE COURT:  Have you fully discussed the report and

9  your sentencing with your attorney?

10          THE DEFENDANT:  I have.

11          THE COURT:  All right.  And so before we get started

12  on discussions regarding the presentence report and

13  sentencing, Mr. Foster, at the time of sentencing, you are

14  entitled to make a statement.  That is, we call it allocution.

15          So let me just start off by asking is there any

16  statement, comments, that you wish to make to the Court

17  regarding the report and/or your sentencing?

18          THE DEFENDANT:  That's correct.

19          THE COURT:  Yes, please do so.  You can either do so

20  at counsel table or podium, whichever you prefer.  If you do

21  it from the counsel table, just make sure you have the

22  microphone available.

23          MR. McKNEELY:  Your Honor, did you want us to do that

24  now before we resolve the objections?

25          THE COURT:  Sure.  So that we can incorporate those

1    into the objections and the discussion regarding sentencing,

2    including 3553(a) factors.

3         MR. McKNEELY:  Understood.  I know there are a few

4    other people who would like to speak as well.

5         THE COURT:  Okay.  If they want to do that first.

6    Again, the only reason I'm doing this first is in

7    consideration of 3553(a) factors, I just want to make sure

8    that all the information is before the parties before I even

9    get to that point.  So I think that after I've done 3553(a)

10   factors, including personal background, et cetera, and then I

11   hear allocution, it's a little backwards in this particular

12   case because I recognize that Mr. Foster has a tremendous

13   amount of information regarding background that I would like

14   the parties to think about and consider when we discuss

15   3553(a) factors.

16        MR. McKNEELY:  Understood, Your Honor.  Thank you.

17        THE COURT:  Yes.  Mr. Foster.

18        THE DEFENDANT:  Thank you, Your Honor.  I appreciate

19   this opportunity to talk about me and this particular case.

20   Your Honor, I want to first start off by saying that we are

21   all human and the jury that was at this case, certainly I

22   appreciate their service, but it's infallible.  The jury's

23   verdict is just infallible.  And we are all accountable to our

24   actions.

25        And I've given 30 years, nearly 30 years of service.

And while my methods may be somewhat unorthodox in dealing with people, I've represented this community exceptionally well, members of the southwest community as well as the Fresno Police Department.  And as you have seen during the trial, there are a number of people who have contacted me that I have established numerous levels of trust with.  And while this case certainly had inferences of misconduct, there was no transactions, there wasn't anything that rose to the level of criminal misconduct.  That was certainly nothing that -- Your Honor, I wouldn't stand before you and waste your time if I was involved in criminal misconduct.

I worked closely with a number of people in the US Attorney's Office and I respect them.  I respect the service that they provide to this community.

But I'm a product of a very proud family.  A family that has been committed to service.  We are committed to education.  The name of the Foster family in this community is exemplary.  And I've worked real hard to honor that of my father, Irwin Foster and my mother Dorothy Foster throughout all that I've done.

I was born and raised in west Fresno.  Worked very closely with a number of members of our community.  I've worked very hard to try to establish myself as someone who was an example for the youth to look at.  If you look at my track record of being involved in youth activities.  Community

groups. My education. I've worked very hard to complete my education. Bachelors degree in business, masters degree in organizational management, a doctoral degree in developers organizational development. I've taught classes, I've taught Community Oriented Policing. I've taught and spoke at a number of venues about the profession of law enforcement as well as working closely in bridging the community.

I've also grown up with a lot of people and had people in my family that didn't always walk on the right side of the law. But I never gave up on them and tried to help them. That has always been my niche and my plan as I worked within the Fresno Police Department. Nothing is always as it seems.

Your Honor, I wouldn't stand before you if I were truly guilty of engaging in that conduct that the jury rendered a verdict on. And I just stand before you just asking you to consider the work that I've done in this community. The service that I've provided throughout the state and throughout the country going around speaking on the profession, the law enforcement profession. And I just would plead under -- certainly the Court for leniency and provide me the opportunity to appeal.

But I stand before you, Your Honor, humble. I'm a father. I'm a representative of this community. I'm dedicated to service. And this is not a true reflection of

who I am as a person and what my career has been in the Fresno
Police Department.  I'm humbled to stand before you.  And I
just want you to know that this case is not truly reflective
of me as a person, me as a leader and me as a family member of
the Foster family.

THE COURT:  Thank you.  And then other individuals
who wish to speak?

MR. McKNEELY:  Your Honor, there are about three
people we'd like you to hear from.

THE COURT:  Sure.

MR. McKNEELY:  I believe Pastor Paul Binion would
like to address the Court.

THE COURT:  Good morning, pastor.  If you could just
state your name for the record.

PASTOR BINION:  Good morning, sir.  My name is Paul
Binion, that's B as in Bible, I-N-I-O-N.

A long time resident of Fresno, sir.  Over 40 years.
I have served as the pastor of the Westside Church of God.
And also we have worked extensively trying to enhance the
quality of life in southwest Fresno, in Fresno particular.

I have known Mr. Foster for a number of years.  We
worked together for the Fresno County Probation Department.
We worked the night shift there at juvenile hall.  And for a
number of months, we spent five nights a week together,
talking, trying to stay awake.  And really became quite close.

He was a very young man.  I was a young father, young husband.
And as we talked about our future, he shared with me that he
believed that he was called to be in law enforcement.  And I
endeavored to discourage him from that, primarily because my
own experiences.

I was born and raised in the south.  And in Alabama,
back in the 1950s and '60s, law enforcement and the courts
were not our friend.  It really gave me a particular
perspective that justice was not equal.  And so I grew up with
that understanding.  And I see things a little differently
now.

But I endeavored to discourage Keith, but Keith said
I believe this is where God has called me to be to serve my
community in law enforcement.  And so he left the department,
went into law enforcement.  I left right after that myself to
go into full-time ministry.

But Keith has really been an example.  He has been a
pace setter, been a standard bearer for us.  In so many areas.
Educationally, as he said.  Here's a person with graduate and
then even a doctoral education.  And also we have watched him
rise through the Fresno Police Department to become the number
two man in the department.  It's quite an achievement for a
person from our community.

And there's never been a question of Keith's
commitment.  Never a question of his devotion.  Never a

1    question of his passion for the community and for people and

2    for bettering the lives of the constituents we all serve.

3    Never a question of his integrity.  Not at all.  And even

4    serving a department where many in our community question

5    them, yet he was able to rise above all of that as far as

6    being exemplary as a law enforcement official as well show

7    great compassion for the people of our community.

8           So I come today as one who would ask that justice

9    would prevail in this situation.  In consideration of who he

10   is, his track record, his character, integrity, the record

11   that he has displayed, the life that he has lived and his

12   commitment to our community and for justice.  I ask that in

13   this case that justice would prevail is my prayer in this case

14   where Mr. Foster is concerned.  Thank you for listening.

15          THE COURT:  Thank you.

16          MR. McKNEELY:  Your Honor, we would like you to hear

17   from Kelly Foster Nelum.

18          THE COURT:  Good morning.  If you could just state

19   your name for the record, please.

20          MS. NELUM:  Good morning, my name is Kelly Foster

21   Nelum.  I am Keith Foster's baby sister.  I appreciate this

22   opportunity to be able to speak before the Courts.  I too,

23   Your Honor, come to you asking for leniency as you consider

24   sentencing for my brother.  I know that there are those that

25   feel that maybe he doesn't deserve that.  But they lack the

1  knowledge and the dynamics of my brother's life.  And I felt

2  compelled to come before you today so that you have that

3  information before you at the time that you render sentence.

4       I stand before this Court today in the stead of my

5  parents, Dorothy and Irwin Foster, who are both influential

6  people, who helped many residents of the Fresno community.

7  Two parents who took great pride in being Keith Foster's

8  parents, our parents.  They made tremendous sacrifices for my

9  siblings and I to become the respectable law abiding

10 productive contributors to society that we are.  They led by

11 way of example.

12      With a blended family of 14, my mother lived being

13 our mother 100 percent of the time.  My father loved his role

14 as our father.  He worked in this community.  He worked hard

15 to support our family.  He was a proud black man, an Army

16 veteran who served his country with pride.  My father worked

17 at the Veterans Hospital for 45 years to support our family.

18 We had two strong parents that kept us humble, making us pick

19 grapes, pitch watermelons and a host of other honest methods

20 of making a living.

21      My father stayed true to his role and he kept his

22 eight sons at his side.  He was their role model, their hero,

23 the person they looked up to proudly, the person that we

24 looked up to proudly.  He taught them to be the best men that

25 they could possibly be no matter what.  My father was the sole

provider for our family.  Not the county, not the foster care system, not the taxpayers, just my father.  My parents.  They shared us with a community in which we resided in west Fresno.  When we misbehaved, the village raised us.

My parents were very protective of us.  He was adamant that we go to school.  Education was a big factor.  He never let us stay at anyone's house.  He kept us in his care and his eye constantly.  And my brother Keith was a little sickly kid growing up, he suffered from asthma.  And my mom and my grandmother babied him a little bit.  But my father saw he was harder on Keith because he saw much for Keith.  He saw great things for him.  He didn't want him to be that little timid kid that limited himself because of his health.

I want to share with you a brief story before I take my seat, Your Honor.  As growing up in west Fresno, it was a little rough for us, but we had our parents and we were always safe.  There were these -- this family that we knew as the Sugarbows (phonetic).  They bullied my brother.  Keith never wanted my parents to know.  So he didn't tell my parents.  And he threatened me not to tell them as well.  But one day, not only did the Sugarbows bully my brother and take his lunch money, rough him up, they made him steal candy from a store at ARCO on the corner of Church and Elm Avenue in west Fresno.  The bullies threatened to repeat this act and had him steal from them from that day forward.

1      And I think my brother was a little more embarrassed

2   because I witnessed that as his little sister and I looked up

3   to him as my big brother.  I witnessed this act as that baby

4   girl.  And although my father was ten feet tall, my brothers

5   were running a close second because I loved them and looked up

6   to them always.  But I remembered one thing that my father

7   taught us when I witnessed this act.

8      And even though my brother didn't want me to share

9   that with my father, I breached that because I remembered that

10   my father told us to fear God and no one else.  But to always

11   trust that he and my mother would keep us safe under any

12   circumstance.  So I made my way home with my brother.  And I

13   shared that information with my father.  My father was a man

14   of few words.  He was stern.  He didn't curse.  And he didn't

15   raise his voice.  But he expressed his disappointment in

16   Keith's conduct.

17      So needless to say, he spanked my brother all the way

18   back to that ARCO store.  He made him give the candy back and

19   apologize to that owner.  And then he gave the owner his word

20   that he had my brother's support for one week.  So after

21   school was out for each -- for that upcoming week, he was

22   picked up from school and taken back to that store to work for

23   free for that owner that he had breached and brought shame to

24   my father.

25      From that day forward, Keith set his goals for

himself extremely high. He stressed and stated that he would
never be bullied again. Asthma would no longer limit his
activities. He played sports, took karate, excelled and
became a second degree black belt. He never, ever broke the
law again. He was a straight A student. He was in the GATE
classes. He decided that he was bored, with school and tested
out at age 15. He played cowboys and Indians with these
little wire bread wrappers and he would always be the one that
saved the guys. He was the savior for each of those victims
that he created. He decided he wanted to become a police
officer at that point because he truly protected and served
his community of Indians and cowboys.

The goal became to never be bullied again. He
enrolled in -- he graduated from high school at 15, enrolled
in the academy for the police department. And his first job
was in Huron on the drug task force. He graduated at the top
of that class and he had options when he graduated. So Huron
was the first offer and six months later Fresno PD. My son
was four months old when my brother took his place on the
Fresno Police Department. My son is 33 years old today.

Keith worked in all capacities and excelled in
everything he touched. While on the force, he climbed the
ranks and earned his bachelors degree, masters, Ph.D. and then
attended law school. As a deputy chief, Keith did his job,
taught classes, facilitated workshops, museums -- taught at

1   the Museum of Tolerance, had speaking engagements, mentored,

2   coached, advocated for the community.  And as I, the Section

3   Director for the STATE NAACP, I always called upon him for

4   people in need.  He was my big brother.

5         And he attended law school.  I share that with you

6   because there was some missing parts to some of the

7   information that was shared about my brother that never made

8   the media, that never made the courts, that never had the

9   opportunity to be expressed to the jurors.  My brother's

10   lifestyle was called into question, as though he were a thug

11   from the street and that he is not.  My brother worked hard

12   for his entire life.

13         And being the deputy chief was not his only hat.  He

14   was paid to teach.  He was paid to consult.  He tested the

15   waters of real estate.  And the last time that I checked, Your

16   Honor, those were not crimes.

17         The other aspect of Keith's life that was not

18   revealed is that he loved being a cop for the Fresno

19   community.  He loved his job.  But his job came with a price.

20   And that price was when Fresno PD took the life of my nephew

21   Eric Foster, my brother was still on that force.  He was not

22   present, he was not in town.  I contacted my brother.  He was

23   teaching in Sacramento.  He had nothing to do with that.  But

24   that action in and of itself divided my family.  That's one of

25   the dynamics that's never been expressed.

1        Eric Foster is Denny Foster's younger brother.  And

2   Denny vowed to get even and to avenge his brother's death by

3   way of my brother Keith Foster.  My brother's not a drug

4   dealer now or has he ever been.  He does -- does he have some

5   covert family members?  Yes.  He does.  As does a few other

6   officers on the force.

7        I ask you at this time, Your Honor, as a respectful

8   trier of fact, that you would consider all of my brother's

9   life and all of the positive attributes that he has made as

10  you render your sentence.  And on behalf of my family, I ask

11  that you make every effort in your power to restore public

12  trust in your leniency and render a sentence favorable for my

13  brother.  Thank you.

14        THE COURT:  Thank you.

15        MR. McKNEELY:  And Your Honor, we'd also ask that you

16  hear from Wesley Flowers.

17        THE COURT:  Good morning.  If you could just state

18  your name for the record.

19        MR. FLOWERS: My name is Wesley Flowers.  I want to

20  thank you for this opportunity, Your Honor.  I greatly

21  appreciate it.  One of the things that I would hope you could

22  consider is that nationally, 95 percent of criminal

23  prosecutors in this nation are white.

24        And that being the fact, sometimes the cultural

25  element, when juries are selected, when you're hearing

1    testimony and when you're hearing things like that, you're

2    missing a big piece of the puzzle because you don't understand

3    the culture or the family dynamics.

4          If there was someone representative in the

5    prosecutor's side or within the jury that understood the

6    culture or understood family dynamics, especially in the black

7    family, you would understand that those communications, those

8    conversations that my Uncle Keith had with Denny Foster and

9    others was that he was getting information as a cop from a

10   cultural perspective.  And he had to build trust and they have

11   to be willing to share information with him due to that trust.

12   And I think that he did a really good job, so much so that

13   that cultural element was missed during his trial.

14         So if you could revisit how that trial went down and

15   understand where I'm coming from in that regard, I think that

16   you would find within yourself that there was some pieces

17   missing.  And that you could draw a conclusion of

18   understanding of why he had those conversations and what he

19   was really searching for.

20         I thank you for this opportunity.  Again, I would

21   hope that you could search within your soul the understanding

22   of those cultural issues that I just mentioned.  And again, I

23   thank you.

24         MR. McKNEELY:  That's all the speakers we would like

25   to introduce, Your Honor.

1      THE COURT:  Okay.  At this point in time, what I'm

2  going to do is allow counsel to be heard with respect to the

3  presentence report, all the factors relating to the advisory

4  Sentencing Guidelines and 3553(a) factors.

5      What I intend to do, after you've had an opportunity

6  to speak, is to go through -- perhaps the cleanest way to do

7  this is to go through Mr. Foster's formal objections to the

8  presentence report.  And I'm going to do that paragraph by

9  paragraph, so I will touch upon everything included in there.

10  And obviously the information, other information that would be

11  relevant in terms of the determination of a reasonable

12  sentence.

13      So I will -- I'm going to get to that.  But certainly

14  you can -- either or both sides can touch upon anything in the

15  presentence report, anything in the Sentencing Guidelines,

16  anything that might relate to 3553(a) factors and anything

17  that's stated in your respective sentencing memoranda and the

18  formal objections.  So let me go ahead and start off.

19      First, on behalf of defense side.

20      MR. McKNEELY:  Thank you, Your Honor.  Your Honor,

21  first, I've informally let the United States know and I'll say

22  on the record that I will withdraw objection CC.  I believe

23  upon review and then reflection on the email that the U.S.

24  Attorney has sent me and a second listen, I believe that they

25  are correct.

1     I would note, obviously the Court can avoid the

2 objections by determining the sentence based without reliance

3 on these portions of the presentence report.  But the sections

4 we've objected to are significant as well because they will be

5 considered by the Bureau of Prisons with regard to my client's

6 classification.  So there is great significance to the matters

7 that we've objected to.

8     The objections preceded in a different order, but the

9 primary grouping I'd like to begin addressing are with regard

10 to the use of Oxycodone to enhance my client's sentence.

11 These are particularly objections T, U, V and W.  Under the

12 guidelines and the grouping calculations made by the probation

13 officer -- and by the way, I'd like to commend Mr. Andrews.  I

14 disagree with the conclusions he reached, but I believe that

15 he, at all times, was very professional and easy to work with.

16 And especially on behalf of my client, I appreciate the

17 opportunity we had to meet with him.

18     Your Honor, Oxycodone, as you know, the marijuana

19 equivalency represents 69 and a half percent of the sentence

20 length that the government is asking for.  The jury did not

21 find that Mr. Foster was guilty of the conspiracies that were

22 alleged.  Now, under the guidelines, it's unclear whether the

23 request to include Oxycodone as an enhancement or the

24 additional time that it would bring is done because they

25 believe that it applies under the grouping standard or that it

1   applies under -- excuse me for just one second.  If it applies
2   under 1B1.3(a).
3       Now, 1B1.3(a)(1) in particular talks about conduct
4   that occurred during the commission of the offense of
5   conviction.  This is under Romanesque iii, that's the
6   beginning of that paragraph, "that occurred during the
7   commission of the offense of conviction, in preparation for
8   that offense or in the course of attempting to avoid detection
9   or responsibility for that offense."  This is one of two
10  theories that it's unclear to me that probation is relying on.
11      Now, the government alleged that Mr. Foster was
12  involved in three separate conspiracies, heroin, marijuana and
13  Oxycodone.  The thrust of their case involved Oxycodone.  It
14  was the bulk of the charges.  It involved an alleged
15  conspiracy between my client and Randy Flowers, in which my
16  client is alleged to have sold his validly obtained Oxycodone
17  prescription so that those could be re-sold by Mr. Flowers in
18  the course of a drug operation.
19      As you were aware, a mistrial was reached on all of
20  those counts and the government has decided not to pursue
21  them.  The counts of conviction were a heroin conspiracy,
22  allegedly involving Ralph or Rafael Guzman and Lashon Jones,
23  and a marijuana conspiracy involving Denny Foster and Ricky
24  Reynolds.  There is not overlap between the Oxycodone and the
25  counts of conviction, the heroin and the marijuana.  They did

1  not occur during the commission of the offense of conviction.

2  They were entirely separate.

3        Now, the other potential basis that they could be

4  arguing is under 1B1.3(a)(2), arguing that because these are

5  offenses of a character which would ordinarily be grouped

6  under 3D1.2(d) that, quote, "all acts and omissions described

7  in subdivisions 1(a) and 1(b) above that were part of the same

8  course of conduct or common scheme or plan as the offense of

9  the conviction."

10        This likewise does not apply.  It is not the same

11  course of conduct at all.  It was entirely separate.  All of

12  the actions allegedly taken in furtherance of an Oxycodone

13  conspiracy were completely different.  They were filling a

14  prescription.  Going to a doctor to obtain the prescription,

15  arguably the government would say, falsely.  And that he then

16  arranged with Randy Flowers to exchange the prescription for

17  money.

18        There is no overlap of personnel involved in this

19  alleged conspiracy.  There is no overlap of means or method of

20  operation.  There is no overlap in any regard.  It is entirely

21  separate.  And the jury did not convict him of this.  But yet

22  the sentence that's being recommended by the United States and

23  by the Probation Service, again, 70 percent, 69 and a half

24  percent of the quantity involved comes from this substance

25  that there was no conviction on.  The evidence is entirely

1   separate and it should not be used.  We object to it.

2           That is the bulk of the objections.  The rest respond

3   to various enhancements that the PSR requests.  First, they

4   request a two level increase of obstruction of justice.  As

5   the Court is aware, these are addressed in objections A

6   through O.  There are two theories that the sentence report

7   relies on that Mr. Foster obstructed justice.  One is perjury.

8   One is influencing or impeding the prosecution of a

9   co-defendant.

10          Let's first address perjury.  These are the

11  objections that fall under A through J.  As the Court is

12  aware, the Court cannot apply or should not apply the

13  guideline increase for perjury as obstruction of justice

14  unless the Court expressly finds that Mr. Foster perjured

15  himself.

16          Now, the PSR treats this as gospel truth, but each

17  and every one of the citations of alleged perjury has an

18  innocent explanation.

19          With regard to the first one in paragraph -- in

20  objection A, paragraph 42 talks about a conflict between the

21  testimony of Mr. Jerry Dyer and the testimony of Mr. Keith

22  Foster.  The probation officer concludes that this was perjury

23  by Mr. Foster, that -- the Court will recall the issue was the

24  project that Mr. Foster said he was working on.  Chief Dyer

25  testified that this project was an evaluation of whether

1  Narcan should be carried in police cars.  Mr. Foster testified

2  that he believed the project involved an investigation of the

3  use of heroin in the City of Fresno and whether it was

4  increasing.  This is a reasonable difference between the two.

5  It's not reflective of perjury.  A conclusion to that effect

6  is unwarranted.

7          Objection B talks about paragraph 43, the discussion

8  about the use of confidential informants.  As we've talked

9  about before, The Bee reported that Mr. Hodgkins said that "my

10 client was deep undercover."  And somehow running confidential

11 informants and himself was undercover.  As Your Honor knows

12 from looking at the transcripts, it was discussed previously,

13 that is not the case.  Mr. Hodgkins did not make that

14 allegation.  Nor did the defense.

15         Now, the government responded in trial to this

16 allegation by basically saying there are only two types of

17 people who give information or are used in the police

18 department.  Confidential informants, and I'm going to put

19 that term in capitals.  Capital C, capital I, confidential

20 informant.  These are men and women who receive payment under

21 a contract for service to the police department and in return

22 receive a benefit from the district attorney's office or the

23 prosecutorial agency that would be reviewing their conduct.

24 The confidential informant has to be vetted by the District

25 Attorney because ultimately these people may potentially be

witnesses in the case. The other sources of information have
been generally used as citizen informants.

Now, the government has taken the position that Mr.
Foster, in his testimony, was talking about the use of Rafael
Guzman and Denny Foster as Big C Big I confidential informants
when that's not the case. They point out that one of them was
rejected by the district attorney's office, the other one
didn't complete the paperwork to even be considered.

But what the government is missing is that Mr.
Foster, with his 30 years of experience, was in a position to
be of assistance to people who were of assistance to the
police department. He knew, based on the relationships he had
with people above him and people at the district attorney's
office, that if he received useful and actionable information
from anyone that could help the police take down an operation,
he could pitch to the district attorney's office a benefit for
the person who gave him that information. Now, that is not
somebody who's contractually required or received payment and
is pre-vetted by the DA. But it is the truth. And it's what
happens.

Mr. Foster was in a position, if he received
actionable information from Ralph Guzman or Denny Foster, to
go to the administration of the district attorney's office and
say, "Look, I work with these people. They're not saints.
But this is the information they've given me, and in

1    particular I'm able to rely on this information, our

2    department has been able to rely on this information to help."

3    That's what he was attempting to do with Ralph Guzman.

4         Now, to the extent that the PSR says that his

5    testimony about this and his plans about this are perjury,

6    that's absolutely false.  Now, I believe that it may have been

7    unclear on direct examination and somewhat muddled because as

8    we've described it in the phantom Bee issue of what was

9    actually happening here.  But what Mr. Foster was testifying

10   to and what he was attempting to do was extract information

11   from people in a position to know it, use it for the benefit

12   of the community and then ask for time off for those people

13   who gave it if it was warranted.

14        Now, the probation department has gone so far as to

15   suggest that there were discussions of a bribe.  That Ralph

16   Guzman in a telephone conversation was using the term "what's

17   the ticket" to try and imply that Mr. Foster could somehow

18   bribe someone or some person to dismiss a case.  When that's

19   not the case.

20        I believe a clearer reading of it, a fairer reading

21   of it, as cited in the objections, is that he was talking

22   about what do I need to do.  What sort of information do I

23   need to bring in order to have this be considered?  That's

24   reflected by the fact that he goes on further, Mr. Guzman, to

25   say, "I'm not interested in no telling either."  Which is the

implication that he is willing to provide the background
information necessary to the police, he does not want to be a
witness at trial. He does not want to be considered a snitch.

I believe that if you went through each of these
paragraphs, each of these objections, which we respectfully
request that you do, that each of the allegations that my
client perjured himself at trial are incorrect. They're all
grouped under the heading Obstruction of Justice. And so we
objected also to that grouping, but the misstatements of the
record.

For instance, there was an objection -- there was an
allegation that he testified falsely when he said that his
family did not know where he was and he was not able to have a
telephone call to explain that to them. That was in regard to
the conversation he had on the way to court with the agents
who were transporting him.

As you recall, the government pointed out that he did
have a telephone call at the Fresno FBI Field Office, but that
did not contradict Mr. Foster's testimony that his family did
not know where he was. Because once he left the Fresno FBI
Field Office, he was transported to the Madera County jail.
He was held incommunicado in Madera County. Not allowed to
communicate with his family. Not allowed to have any of the
correctional officers at the Madera facility communicate with
them. His testimony about that is true.

1        And each one of these situations that the

2   government -- or that the PSR points to as potential perjury

3   all have explanations that are consistent with the record that

4   are inconsistent with perjury.

5        With regard to influencing or impeding a

6   co-defendant's prosecution.  This is another basis for the

7   reduction -- for the imposition that the government is

8   requesting of obstruction of justice.  Again, we've addressed

9   his efforts, his discussion of efforts to help Mr. Guzman.

10  But we also object to, in paragraph L -- or objection L, we

11  object to the paragraph in which it is implied that he's

12  bribing somebody.

13       Again, there is no evidence offered of this at trial.

14  No argument made to that effect at trial.  Nor is there

15  anything in the record of a conversation that supports it or

16  any conduct that would also support that he attempted to bribe

17  him or anyone else.  The only other potential thing I could

18  think of is that there was a discussion that Mr. Foster had

19  with some employees when Denny Foster was arrested in Merced.

20       Now, the fact that Mr. Foster attempted to uncover

21  information about Denny's arrest does not mean that he was

22  attempting to impede any prosecution that would result from

23  that.  Nor did he exert any influence from it.  The fact is,

24  and it was acknowledged, I believe, by the government's case

25  agent during the grand jury testimony, that law enforcement

1   officers will routinely look into other agencies' reports and

2   other agencies' arrests.  That does not mean that by asking

3   about it, they're attempting to influence.  Rather, they're

4   attempting to use their position to uncover and find out more

5   information about what's actually happened.  But not in a way

6   that's designed to impede a prosecution.  I don't believe

7   there's any credible evidence that he did that.

8          The government's also asking for a two level

9   increase, arguing the abuse of a position of trust.  As the

10  Court is aware, this is addressed in defense objections P

11  through S.  If found, the Court would obviously be in a

12  position to increase the offense level by two levels.

13         But again, there is no conduct here that is based on

14  his role as a deputy police chief.  This isn't a situation

15  where he is an employee of the immigration enforcement agency

16  who's taking a bribe to allow a suspect out of custody.  It's

17  not a situation where he's a corporate officer or manager of a

18  bank allowing someone to have access to the vault after hours

19  to rob it and benefit from it.  There's nothing about his role

20  as a police officer that was being abused in the conduct that

21  the government alleges.

22         And by the way, I say "in the conduct that the

23  government alleges."  We respect the fact that the jury

24  reached a verdict.  Mr. Foster maintains his innocence and as

25  I've argued to you, I believe there's insufficient evidence.

1   So I mean no offense when I say "alleged."  I'm attempting to

2   address the government's position anticipated as fairly as I

3   can.

4         We do not believe that any evidence has been shown

5   that would warrant the application of this two level increase.

6   Again, he is a police officer.  He was a police officer.  The

7   evidence you've heard from the people here in the community is

8   that that was his identity.  But there's nothing specific in

9   the conduct alleged in this crime that benefited from the fact

10   that he was a police officer.

11         They alleged nakedly, or without support, that

12   somehow his position there facilitated this operation.  But

13   yet there is no evidence they can point to that suggests that

14   he did it.  There's no evidence that he diverted resources,

15   that he was paying attention to schedules of patrols and was

16   able to tip people off to when this was going to happen or

17   that was going to happen.  It just isn't there.  They're

18   asking you to make this finding based on telephone

19   conversations and the mere assertion of his job.

20         We also argue, Your Honor, for a minimal role

21   adjustment.  This Court has already sentenced Ralph Guzman and

22   Denny Foster, people who are admittedly involved in serious

23   drug operations.  Mr. Foster is alleged to have participated

24   financially by basically investing.  The argument is that he

25   handed money to somebody and then received a return from the

money.  There's no indication that he handled drugs, that he

directed where they be sold, that he directed where they be

purchased.  There's no indication that he is responsible.  And

the probation report doesn't hold him responsible for all of

the drug operations that these two men are involved in.

There's no indication in particular with regard to

Ralph Guzman that any drug transaction successfully occurred.

The only argument there tangentially is they've alleged that

he helped facilitate the potential drug transaction between

Lashon Jones and Mr. Guzman that everyone concedes didn't

occur.  And there is no indication of what benefit Mr. Foster

was to receive other than perhaps introducing them to each

other.  Although there is one vague reference that it would be

to Mr. Foster's benefit.  That is a statement from Mr. Guzman.

These men are hard core drug dealers who have

admitted to dealing over a significant period of time.  Large

quantities in different states affecting many, many people.

The government's evidence is that Mr. Foster is basically a

tagalong who was receiving money for doing nothing.  Doing no

work, other than fronting cash.  And I believe he qualifies

for a minimal role reduction or perhaps a minor role reduction

of two.

The miscellaneous objections I believe speak for

themselves.  We object to the consideration of information

based on the statements of Denny Foster and Lashon Jones.  We

1    have not had the opportunity to cross-examine them.  If the

2    Court intends to rely on them and allow those statements to

3    stand, we request an evidentiary hearing on all of that.

4    Denny Foster has a motivation to lie about my client.  Lashon

5    Jones' statement is potentially ambiguous and not consistent

6    with the role ascribed to her by the government.

7           Thank you for enduring my discussion about the

8    objections.  And now I can tell you what I really want to tell

9    you, which is this is a good man.  Keith Foster is a very good

10   man.  I did not know Mr. Foster before this case.  And I've

11   had an opportunity to spend a lot of time with him and tell

12   you that he is a true and genuine gentleman who really cares

13   about our community.  It's obvious in the work that he's done

14   in our community.  It's obvious in the role that he serves.

15          He is not just the individual who was the Deputy

16   Chief of Police, but he represented a large segment of

17   Fresno's community that otherwise wouldn't be represented in

18   the government.  It's not news to anyone that there is a lot

19   of tension and difficulty in this community and others between

20   the African American population and the police.  Study after

21   study after study shows that in situations, there is implicit

22   bias that affects everything.

23          It affects -- in fact, there are studies I listened

24   to last night in a continuing education about shooting

25   scenarios who they show a suspect who's white versus a suspect

1    who's black and both have like a cell phone in their hand or a

2    wallet in their hand.  And studies show the exact same suspect

3    who has the wallet or cell phone in their hand is white is

4    shot much less often than the black suspect.  I don't argue

5    that this is conscious or that anybody chooses to do it, but

6    the truth is there is implicit bias.

7         And having Keith Foster in our community and in his

8    role as a Deputy Police Chief, it protected that community.

9    It gave voice to that community, which isn't represented.  It

10   made sure that the police department would consider the views

11   of the minority.

12        You know, one of my concerns -- I've never

13   represented a police officer before.  And one of my concerns

14   was usually, as a defense attorney, the police officer is the

15   natural enemy.  And when Keith and I sat down, in fact, we had

16   a lengthy conversation before we met with Mr. Andrews.  We

17   talked about the use of force and my concerns about the fact

18   that police departments, and particularly Fresno, appears to

19   use force more than is necessary.

20        And I wasn't sure how Keith would come down or what

21   he would say about it.  But he had a very thoughtful response.

22   In fact, he'd studied the issue.  He'd written on the issue.

23   And it is a combination of training and it's a combination of

24   fear and confidence that officers in the street generally tend

25   to respond in a more balanced and objective way the more

1  confident they feel.  And when they're in a situation of fear,

2  that's sometimes when they begin to make bad decisions and bad

3  judgment.

4          What I appreciated about Keith's response was that it

5  reflected both the truth, as we see it in society, that

6  there's a disproportionate group of people that have negative

7  outcomes with the police.  But it also reflected a deep

8  understanding of what it means to serve as a law enforcement

9  officer.  And it reflected serious consideration of what

10  should be done in the future going forward to prevent these

11  from happening again.  Keith's solution had to do with

12  training.

13          And I bring that up because the worst punishment that

14  will come from this case, as we've noted in our sentencing

15  memorandum, has already come.  Mr. Foster's law enforcement

16  career is over.  That's a big blow to him.  But it's a much

17  larger blow to our community.  Mr. Foster will never serve

18  again as a peace officer.

19          In fact, all of the firearms that the government

20  mentioned when they served the search warrant, all the guns

21  that he owned by virtue of the fact that when the police

22  department transferred from a Beretta to a Smith & Wesson, et

23  cetera, and they retire the old weapons and they allow you to

24  buy your old service weapon.  All of those weapons he owned in

25  his 30 year career, he has to relinquish.  He can never own a

1 firearm gun again. It's as if a whole part of him has been

2 lost and stripped and is gone.

3      Not many of us could survive having our picture on

4 the front page of the newspaper on a monthly or weekly basis,

5 or being in the news frequently. And especially couldn't

6 handle it for the things that we've done that we're not proud

7 of. And that's what he has to deal with now. He's not

8 someone who comes before you with a criminal record, although

9 after Ms. Foster-Nelum's story, I'm hoping that they're not

10 going to add that theft.

11      He does not have a criminal record. He's somebody

12 who has lived his life in an upstanding and honorable manner.

13 He's in his 50s. He is not somebody who will ever come before

14 this Court again because of other misconduct. Any sentence

15 you give him is just in addition to the sentence he has

16 already received. We ask that you consider what Congress has

17 directed us, that a sentence should be sufficient but not

18 greater than necessary to reflect the seriousness of the

19 offense, deter criminal conduct, protect the public.

20      The public has been protected. There is no argument,

21 reasonable argument that Mr. Foster is a threat to the public.

22 He's been out of custody. He's done well. He continues to

23 make all of his court appearances. He is a well known and

24 public figure. He's not going to be a danger to others. You

25 have deterred any potential criminal conduct by him and the

1  publicity his case has received will deter others.

2         I don't know many people who know that if their calls

3  were being listened to 24 hours a day seven days a week by the

4  ATF or the FBI would not feel that they have skeletons in

5  their closet that they were afraid of being aired in public.

6  I believe that just this very prosecution has deterred

7  criminal conduct for people who might be similarly situated.

8  And it has certainly deterred any future conduct by Mr.

9  Foster.

10        The seriousness of the offense is also reflected by a

11 sentence, but not one that needs to be as severe as those that

12 the Court has already imposed on Ralph Guzman and Denny

13 Foster.  If I'm not mistaken, the Court has sentenced one to

14 40 months and another to 33.  Both of these men

15 acknowledged -- pardon me.  33 months for Mr. Flowers, 18

16 months for Denny Foster and 40 months for Ralph Guzman.  Randy

17 and Ralph have both acknowledged being in long-term hard core

18 drug sales and in the business.  And I can understand why the

19 Court would give them those lengthy sentences.

20        I believe both also have criminal records that place

21 them in a different category.  Mr. Foster, Denny Foster, was

22 sentenced to 18 months.  And again, is somebody I believe with

23 a criminal record and also a much longer involvement in this

24 sort of operation.

25        I believe, as we've noted in our objections, that the

proper offense level excludes Oxycodone, it excludes
allegations of abuse, it excludes allegations of obstruction
and it includes a minimal role adjustment.  I believe the
proper offense level is 12.  I believe the proper sentence
ought to be ten months.  I'm requesting the Court split it
five months in prison, the other five months being served on
community confinement as part of supervised release.

If the Court disagrees with our findings about the
offense level, we respectfully request that you consider a
departure under the 3553(a) factors.  We believe that the
punishment that Mr. Foster has already received by being
targeted in this way on a case that may not have been brought
against other defendants similarly situated.

We believe that the media response, we believe that
the loss of his career, we believe all of these things have
already given the Court and given Mr. Foster the punishment
that he needs.  So we respectfully request that if you
disagree with us on the calculations, that you depart
downward.

And again, I can assure you that Mr. Foster will not
be back before Your Honor again for any type of offensive
conduct.  And again, although we disagree with the jury's
verdict, we respect this Court.  We respect the process and
the integrity of your decision and we request that you
consider the leniency that I and others are asking for in all

1    those letters you received and the folks you've heard from

2    today.  Thank you, Your Honor.

3         THE COURT:  On behalf of the government.

4         MS. ALSWORTH:  Thank you, Your Honor.  Your Honor,

5    the government is standing by the recommendation that's been

6    made in the presentence report for a sentence of 78 months

7    imprisonment.  And for reasons I'll discuss in just a moment,

8    I think this is more than reasonable and takes into account

9    the seriousness and reflects a just punishment for Mr.

10   Foster's involvement in these drug trafficking conspiracies.

11        I definitely don't envy the Court's position -- and

12   there's a juror here today -- hearing from a bunch of

13   different people about why we think a particular sentence is

14   appropriate.  And there's something that stood out from me

15   from the presentence report.  It's paragraph 130 that talks

16   about Mr. Foster's duplicitous role, if you will.

17        As a police officer, there's no dispute that he

18   represented this community and he represented a minority

19   population in this community that, as Mr. McKneely pointed

20   out, may not have been heard otherwise within the Fresno

21   Police Department and throughout other areas of Fresno.

22        But at the same time, he was engaging in criminal

23   conduct when he worked with Rafael Guzman and Lashon Jones in

24   this heroin conspiracy and when he worked with his nephew

25   Denny Foster in the marijuana conspiracy.  And the government

1  alleges, even though the jury found otherwise, that he was

2  also involved in the conspiracy with his other nephew Randy

3  Flowers to distribute Oxycodone.

4          And for those reasons, the government believes that

5  the 78 months is very representative of the seriousness of

6  this offense and it encompasses the conduct in which Mr.

7  Foster was involved.

8          I'll turn to the drug quantity.  And this was set

9  forth in the government's sentencing memo.  I know the Court

10 indicated it had read the sentencing memo.  And just briefly,

11 I'll point out that the government's base offense level

12 started with the calculation of the drug quantity in this

13 case.  The government alleges that one ounce of heroin was the

14 subject of the conspiracy with Mr. Foster, Mr. Jones and Mr.

15 Guzman.  And I believe that's supported by the record, the

16 trial testimony.

17         And the government also referenced the affidavit of

18 Special Agent Reynolds discussing the prices of heroin at the

19 time.  So I believe there's sufficient information for the

20 Court to find that one ounce of heroin was the subject of the

21 heroin conspiracy.

22         With regard to the marijuana conspiracy, the

23 government has alleged a total of 15 pounds of marijuana

24 that's attributable to Mr. Foster for the reasons set forth in

25 the memo.  And regarding the Oxycodone conspiracy, the

1   government is attributing 398 Oxycodone pills to Mr. Foster.

2   There's a two pill discrepancy between the government's

3   recommendation and pretrial's.

4       But with the Oxycodone, it is relevant conduct, Your

5   Honor.  When you look at 1B1.3 and it defines "relevant

6   conduct," this is conduct that -- first of all, it is conduct

7   that Mr. Foster engaged in.  And even though these counts were

8   essentially being dismissed today, the Court has heard this

9   evidence.  And although the jury was hung on those particular

10  counts, the Court can still consider them.  The guidelines and

11  the case law make clear that even acquitted conduct can be

12  considered by the Court in terms of sentencing.

13      As far as relevant conduct is concerned, this is

14  conduct that Mr. Foster engaged in, that he worked with Mr.

15  Flowers to contribute Oxycodone to Mr. Flowers' distribution.

16  And also in terms of just grouping.  This is -- it represents

17  a common scheme or purpose.  It shows that when you consider

18  the heroin and the marijuana conspiracies, the Oxycodone fits

19  within that similar paradigm of he was selling his Oxycodone

20  prescription to get money.

21      So in terms of comparing, like what the common

22  purpose was with one conspiracy, it's clear that the Oxycodone

23  is relevant in the sense that he was gaining the same benefit

24  from that.

25      Turning to the perjury and the formal objections that

1   Mr. McKneely raised.  The government does address the issue of

2   the obstruction of justice enhancement.  It begins on page 11,

3   I believe, of the government's sentencing memorandum.  And the

4   Section 3C1.1 of the Sentencing Guidelines says that a two

5   level increase is an appropriate enhancement for a defendant

6   who obstructs or impedes the administration of justice.

7           And for this particular enhancement to apply in the

8   context of false testimony or perjury, the Court has to make

9   specific findings that the defendant gave false testimony,

10  that the false testimony was on a material matter, and that

11  the testimony was made with willful intent.

12          And I submit to the Court that the Court is in the

13  best position here to judge whether or not this particular

14  enhancement applies because the Court was privy to all of the

15  testimony.  Not only from Mr. Foster, but from other

16  witnesses, and is in a position to gauge whether or not Mr.

17  Foster's testimony was false, was willful and was given on a

18  manner that was material.  It's the government's position that

19  it was.  And the government has cited numerous cases of that

20  testimony in its sentencing memorandum, which I'm happy to go

21  into more detail if the Court would like.

22          And just addressing some of the specific paragraphs

23  in the defendant's formal objections.  Under paragraph B,

24  objection to paragraph 43.  It's the government's position

25  that paragraph 43 is supported by the record and the trial

1    testimony, in particular from the record of trial testimony

2    pages 790 and 859.  I believe that there are statements that

3    support the presentence report in those respects.

4            Regarding the objection to paragraph 43.  And what

5    Mr. Kirkland knew or didn't know.  I believe it's clear from

6    Mr. Kirkland's testimony that he knew that he wasn't engaging

7    in drug trafficking or setting up deals with Dennis Foster.

8    And so the statement regarding Mr. Kirkland in the PSR, I

9    submit that the Court should leave in there.

10           Turning to paragraph 41.  This is objection K of the

11   formal objections.  There's discussion in the PSR about

12   whether or not Mr. Guzman was essentially asking to buy his

13   way out of a State case.  And there was trial testimony from

14   several individuals, Mr. Foster for sure and I believe Special

15   Agent Reynolds who agreed that "ticket" was a term that is

16   commonly used as price.  And nowhere else do we have an

17   interpretation of "ticket" to mean what sort of action do I

18   need to bring to you to get rid of my case.  So I believe that

19   the PSR correctly interprets that particular comment and it

20   should remain in the PSR.

21           Just several other things in closing, Your Honor.  I

22   believe I've gone through the majority of the objections that

23   needed a response.

24           Before I turn to the closing statements, Your Honor,

25   I'll discuss briefly the adjustment for abuse of position and

1    trust, 3B1.3, which says that "If the defendant abused a

2    position of public or private trust or used a special skill in

3    a manner that significantly facilitated the commission or

4    concealment of offense, then the two level increase is

5    appropriate."

6         In this circumstance, the government is asking for

7    the two level increase.  Not because Keith Foster was a police

8    officer, but because of the activities that Keith Foster

9    engaged in while he was a police officer, because, in fact,

10   those activities he was in a position to protect the people

11   that he was working with and the government alleges that, in

12   fact, he did do that.  In a followup call, after Denny

13   Foster's arrest, he was talking with Lashon Jones -- and I

14   apologize to the Court, I don't have the call number with me.

15   But he did tell Lashon Jones to be extremely careful in light

16   of Denny Foster's arrest.

17        And dealing with Mr. Guzman, again, he was in a

18   position to know if Mr. Guzman was having other contact with

19   law enforcement officials or if there was anything that came

20   to light that could potentially affect Ms. Jones or Mr. Guzman

21   or Mr. Flowers or Mr. Foster, Keith Foster was in a position

22   to take that information and spin it in a way that protected

23   them and protected his drug trafficking activities.

24        I think this also becomes clear when you consider

25   what happened after Denny Foster's arrest.  Because after

1 Denny Foster was arrested on January 3rd of 2015, we know from

2 other testimony it was clear at that time that Denny Foster

3 didn't have any intention of working with the Fresno Police

4 Department.  And at least two other officers testified that,

5 by January, they knew Denny's information wasn't going to be

6 good and that he wasn't going to follow through.

7 So following his arrest, when Mr. Foster reaches out

8 and says "let's find out about Denny and what's going on" and

9 instructs Sergeant Wilson to do so, it's for the purpose of

10 protecting his particular criminal activity with Denny Foster.

11 Because if he can get Denny Foster off the hook, then the

12 marijuana trafficking continues.

13 This case was, I would say, difficult is probably not

14 strong enough a word for everyone that was involved in it.

15 It's very difficult to be investigating a police officer

16 because, as a government employee working with law

17 enforcement, you want to believe that law enforcement is

18 acting in the best interest of the community.  And it's

19 disheartening when you find out that that's not the case.  And

20 here we have a situation where on the one hand Mr. Foster was

21 able to serve his community.  But he was also breaking the

22 law.

23 He doesn't meet the requirements for a minor role

24 adjustment in this particular circumstance.  There's nothing

25 to support that recommendation.

1       The Court in this case should find that the drug

2   quantity as alleged in the PSR and as discussed in the

3   government's sentencing memorandum is an accurate reflection

4   of the conduct in which he engaged.

5       The Court should add the two levels for abuse of

6   position of trust and for obstruction of justice and sentence

7   Mr. Foster to a term of 78 months.

8       I do understand that this is higher than some of the

9   other defendants have received, but they didn't receive

10  adjustments for abuse of position of trust or for obstruction

11  of justice.  So he's not in the same position that they're in.

12  They also received the benefit in terms of acceptance of

13  responsibility.

14      And I certainly respect that Mr. Foster maintains his

15  innocence even to this day, but I do want the Court to be

16  aware that there were other factors that resulted in the

17  sentence that those defendants received.  Just like there's

18  specific factors in Mr. Foster's case that didn't apply to

19  those other defendants.

20      I believe that's all, Your Honor.  Thank you.

21      THE COURT:  All right.  Let me ask the government.

22  The government did not address objections DD, EE and FF.  DD

23  and EE relate to paragraph 34, the Denny Foster's apparent

24  proffer.

25      MS. ALSWORTH:  May I start with EE because the

1  government will agree to have that removed from the PSR.

2          THE COURT:  All right.

3          MS. ALSWORTH:  Regarding the objection to paragraph

4  34, give me just a moment, Your Honor.  The government has no

5  objection to that paragraph being removed.

6          THE COURT:  And FF, objection to paragraph 64 and 65.

7          MS. ALSWORTH:  No objection to the removal of 65.

8  May I have just a moment?

9          THE COURT:  Yes.

10          MS. ALSWORTH:  Your Honor, with regard to paragraph

11  64, the government has no objection to it being removed

12  because I think the trial testimony and also the government's

13  argument in connection with abuse of position of trust where

14  Mr. Foster is heard on the call saying "If I had known X, Y

15  and Z," I think it's just duplicative of that type of

16  evidence.

17          THE COURT:  All right.  With respect to defense

18  objection DD, objection to paragraph 34 based on Denny Foster

19  interview.  That objection is sustained.  Paragraph 34 will be

20  deleted from the final PSR.  And that also resolves objection

21  EE.

22          Objection FF, I'll sustain the objection.  Paragraph

23  64 and paragraph 65 to be deleted from the final PSR.

24          Therefore, none of those deleted paragraphs will be

25  considered by the Court in fashioning a reasonable sentence in

1  this case.

2          MR. McKNEELY:  Your Honor, may I respond briefly to
3  the government?

4          THE COURT:  Yes.  Anything else on behalf of the
5  government?

6          MS. ALSWORTH:  No, Your Honor.

7          THE COURT:  Defense.

8          MR. McKNEELY:  Thank you, Your Honor.  Your Honor,
9  first, the three areas I'm going to talk about in rebuttal,
10  the Oxycodone, the abuse of position of trust and the
11  sentences that others received.

12          With regard to Oxycodone, the Court really has to
13  dive into the use notes, the commentary beneath 1B1.3.
14  Because what the government is basically saying, they're
15  ignoring the commentary that talks about the requirement of
16  the common scheme or plan or the same course of conduct.  Note
17  five, subdivision (B) under 1B1.3 talks about a common scheme
18  or plan.  "For two or more offenses to constitute part of the
19  common scheme or plan, they must be substantially connected to
20  each other by at least one common factor, such as common
21  victims, common accomplices, common purpose or similar modus
22  operandi."

23          Now, the only thing they have in common is the fact
24  that they both involve narcotics and are both regulated by the
25  United States Code.  Other than that, they're entirely

1 separate.  And the way they were conducted is entirely

2 separate.  Ms. Alsworth hangs her hat on the fact this is

3 conduct that Mr. Foster did.  And we'll -- we won't challenge

4 that for the purposes of this reasoning, except to say that

5 the relevant conduct here cannot be anything a person does,

6 just that it happens in the same time period.

7 　　　　The issue is that the government alleges it was a

8 completely discrete operation involving completely different

9 people, completely different substance, completely different

10 means and method of conducting it, but yet it represents 69

11 and a half percent of the amount of time that the guidelines

12 provide for.  They're asking you to find him guilty where a

13 jury didn't and find that somehow this alleged sale of his

14 prescription amounts to the same thing as what he was

15 convicted of doing with Ralph Guzman and with Lashon Jones.

16 The commentary and the relevant conduct show us that that's

17 just not what ought to be or is considered.

18 　　　　Second argument.  When they talk about abuse of

19 position of trust, she accurately quotes 3B1.3, but I would

20 like to highlight for you the language that matters, which is

21 in the second line.  "Significantly facilitated the commission

22 or concealment of the offense."  Significantly facilitated the

23 commission or concealment of the offense.  She cites to a

24 throw away line in which Mr. Foster says to Ms. Jones, "Be

25 careful out there."

1    First of all, "be careful out there," how does that

2 significantly conceal or facilitate the commission of the

3 offense?  And what part of being a police officer is

4 particular to advising someone to be careful?  It just isn't

5 there.  The conduct that they're asking for just isn't there.

6    Which leads me to the third point.  They talk about

7 the disparity, the great disparity in the sentences that

8 they've given to the people who cooperated versus what they're

9 asking for Mr. Foster.  And their explanation to Your Honor

10 is, well, they didn't receive an increase for abuse of trust

11 or obstruction of justice.  Which is misleading because, as

12 they well know and as the Court knows, both of those are two

13 level increases.

14    So let's assume that Mr. Foster did not get those two

15 level increases but the Court were to rule Oxycodone applies,

16 that would still only take his guideline sentencing range down

17 to 51 months.  The people that they've dealt with, who are the

18 significant criminals in this case, received 40, 33 and 18.

19    It is not just a use or abuse of position of trust or

20 obstruction of justice, it's an attempt to loop three

21 different separate organizations into one and to punish Mr.

22 Foster for conduct that the jury couldn't agree on.  Yes, of

23 course the Court can consider this sort of conduct.  But the

24 guidelines tell us why and when we can consider it.

25    This is not a black and white situation where you say

1   Denny Foster didn't fulfill his role as a confidential

2   informant, therefore he didn't want to be one.  As in life,

3   there are shades of gray.  My client was attempting to help

4   these individuals and in so doing is here in front of Your

5   Honor facing sentencing now.

6        Everything I've told you about his conduct and his

7   character and everything you've heard from the community is

8   absolutely true.  This is a man who has been harshly punished

9   already for his misconduct.  Anything that Your Honor gives

10  him now will simply be in addition to that and would be more

11  than necessary to deter future conduct or the other purposes

12  in sentencing law.

13       We ask that you find, as we've requested, level 12 or

14  that you depart downwards to consider that sentence.  We have

15  specific recommendations if the Court does order a custodial

16  sentence.  May I approach madam clerk?  And I have a copy for

17  the government as well.

18       THE COURT:  Sure.

19       MR. McKNEELY:  Your Honor, this language is very

20  specific because my research indicates that the Bureau of

21  Prisons will respond better to very specific language and

22  reasons.  I specifically request if you order custodial

23  commitment, that the Court recommend the defendant's placement

24  at FCI Dublin to facilitate regular family visitation.  In the

25  alternative, the Court recommends placement at FCI Lompoc to

1    facilitate regular visitation.

2         We also request that you make a finding -- should you

3    make a sentence that's eligible, that there be a direct

4    designation to a halfway house.  The reason we've asked for

5    the split is it's suggested by the guidelines as required.  It

6    is not our position that Mr. Foster zealously needs to go to

7    prison or needs to go at all.  But we recognize that this is

8    conduct that needs to be punished and needs to be deterred.

9         We recognize that this Court has a responsibility to

10   the community, it needs to be seen to have done justice.  But

11   holding him accountable for something that is entirely

12   separate from what he was convicted of would not be seen to

13   have been done justice.  And to punish him more harshly than

14   the men who are the responsible parties in this case would

15   also not be seen to have done justice.  That's why we made the

16   recommendation we have.  And we stand by it.  Thank you.

17        THE COURT:  Okay.  It's 11:30.  We've been going for

18   an hour and a half.  I'm going to take a 15 minute break.  I

19   will come back in and I'll just go ahead and complete my

20   analysis on the record and impose the sentence.  We will go

21   into the noon hour.  So 15 minutes and then however long it

22   takes, we'll go ahead and complete that.

23        But obviously, both sides have covered this very

24   completely, but I do need to place certain matters on the

25   record.  So we'll take a 15 minute break, come back in and

1  we'll go until completion.

2      (Recess.)

3      THE COURT:  All right.  As I indicated earlier, I

4  have reviewed very carefully everything that's been presented

5  to me regarding factors to be considered for sentencing.  I

6  need to make a couple of comments at the outset.  First of

7  all, I'm going -- I'm going on the assumption, which I need

8  to, is that this is a sentencing process.  My personal

9  thoughts, opinions regarding how the trial went or the outcome

10  of the trial is not before me.  And so my observations and my

11  rulings are based upon the fact that I am sentencing an

12  individual who has been convicted of two separate offenses.

13      With respect to my rulings, whether the plaintiff's

14  side or the defense side disagrees with my rulings, all I can

15  tell you is that I've reviewed all the information that you've

16  provided, I reviewed the transcripts of the trial, I've

17  reviewed my notes.  I have looked very carefully at the

18  presentence report.  And there may be some disagreements as to

19  my findings, but I have done the best I can to review the

20  materials and come to a reasoned decision.

21      The way best to proceed is simply to follow and track

22  Mr. Foster's formal objections to the presentence report.

23  I'll be making references to individuals.  I don't mean to be

24  disrespectful, but just to move it along.  Iran Dennis Foster,

25  I may refer to as "Denny Foster" or "Denny."  Rafael Guzman, I

1   just may refer to as "Guzman."  I will alternatively refer to

2   Keith Foster as "Mr. Foster" or "defendant."  And other

3   individuals, I may refer to by first name or last name only.

4   I don't mean to be disrespectful, but I just want to move the

5   case along and make sure that the parties understand who I'm

6   referring to.

7        The defense formal objections basically break the

8   discussion and objections down into discrete categories.  So

9   I'll go ahead and follow along on that format.  The first

10  section in the formal objections is Obstruction of Justice,

11  Perjury.  Starting with paragraph A, which is an objection to

12  paragraph 42.  And I won't read the specific objection, but I

13  have noted them.

14       I also need to mention, both sides have cited to

15  excerpts from the trial itself and case authority.  I've

16  reviewed all of those.  I may mention an excerpt here and

17  there.  I may mention a case here and there.  I've reviewed

18  them all.  But I have considered all of the information

19  submitted by the parties, including citations to case

20  authority and citations to the record.

21       With respect to objection to paragraph 42 regarding

22  the testimony of Chief Dyer.  I have reviewed the transcript

23  of the testimony of Police Chief Jerry Dyer taken on May 17,

24  2017.  The presentence report accurately reflects Chief Dyer's

25  testimony.  Now, the fact that the defense recollection

1  differs from Chief Dyer's recollection does not adversely

2  affect the credibility of Chief Dyer's testimony.

3       And as it relates to what Mr. Foster's assignment

4  was, Chief Dyer testified very clearly that the assignment he

5  gave to Mr. Foster to determine whether or not there were drug

6  heroin overdoses in the City of Fresno came during and

7  immediately after a conference that both Chief Dyer and Mr.

8  Foster attended where there was a discussion as to whether or

9  not there was an epidemic of heroin overdoses such that

10  -- whether or not Chief Dyer should request funding for

11  Narcan, which is essentially an antidote for heroin overdoses.

12  And that was credible.

13       Ironically I just read in the paper the other day

14  that either he's requesting or been approved for arming his

15  officers with Narcan.  But nonetheless, I find that the

16  objection is not well taken, the objection is overruled.

17       The objection to a portion of paragraph 43.  I have

18  reviewed the May 17, 2017 transcript of Mr. Foster's testimony

19  at page 858, line 25 to page 859, line 8.  Now, I'm going to

20  refer to excerpts and I'm going to read directly from the

21  excerpts.  And I've read the questions and answers before and

22  after the excerpts just to make sure that I didn't misstate

23  the context of those statements.

24       Okay.  This is a question from trial counsel.

25  "Then Denny said to you, 'Let me'" --

1 And the trial counsel:  "You correct me, Keith, on this.

2 Then Denny said to you, 'Let me text you back in a

3 second'?

4 "Answer:  No" --

5 Answer by Mr. Foster.  "No, I said, 'What do you want to

6 tell my boy,' in reference to Detective Kirkland.

7 "Because there was three conversations in the month of

8 December in which Denny was going to set up a deal.  He

9 had sent us on wild goose chases.  When I say 'us,'

10 Sergeant George Wilson and Brannon Kirkland."

11 So the PSR accurately reflects the testimony of Mr.

12 Foster.  The objection is overruled.

13 C, the objection to a portion of paragraph 43 in the

14 May 17th, 2017 transcript of Brannon Kirkland's testimony,

15 page 962, lines 9 through 15.

16 "Mr. Rice:  Sara, now, if you'd please play a call,

17 this is Session 7917, which was on December 14th.

18 "(The audio was played.)

19 "By Mr. Rice:  Question:  The 'my boy' that Keith

20 Foster is referring to in that phone call, that

21 wasn't you; was it?

22 "Answer:  No."

23 The PSR accurately reflects the testimony of Brannon

24 Kirkland, who heard the recording of Mr. Foster and who then

25 testified from personal knowledge.  The objection is

1  overruled.

2         Objection D is an objection to paragraph 43. And in

3  this case, I find that paragraph 43 is relevant to the issue

4  of obstruction of justice. Defendant's general objection is

5  overruled.

6         Objection E, which is an objection to paragraph 44.

7  Again, paragraph 44 is relevant to the issue of obstruction of

8  justice and defendant Mr. Foster's general objection is

9  overruled.

10        Objection F is an objection to paragraph 45. The May

11 16, 2017 transcript of Mr. Foster's testimony at page 768,

12 line 25 to page 769, line 8.

13        "Question: Now, concerning Rafael Guzman, did you

14        contact either Sergeant George Wilson or Brannon

15        Kirkland?"

16        Answer by Mr. Foster: "Yes. Pertaining to Rafael

17        Guzman, early on, contacted Detective Brannon

18        Kirkland of the Fresno Police Department Narcotics

19        section.

20        "Question: Okay. How did you contact him?

21        "Answer: I spoke with him on the phone. And then

22        there is text messages between Brannon Kirkland and

23        myself regarding Rafael Guzman's desire to work as an

24        informant."

25        And then Mr. Foster goes on to testify extensively

1  regarding Rafael Guzman as an informant.

2           The May 16, 2017 transcript of Mr. Foster's

3  testimony.  Page 791, line 6 through 14.

4           "Question:  So you have referred Rafael Guzman and

5           Iran Denny Foster to the Narcotic Units of the police

6           department?

7           "Answer:  That's correct.

8           "Question:  And at that time, you are a Deputy Chief;

9           correct?

10          "Answer:  That's correct.

11          "Question:  What you do is you refer any tips or any

12          possible work that can be done for the Narcotics Unit

13          to the narcotics people; is that correct?

14          "Answer:  That's correct."

15          This testimony by Mr. Foster is within the context of

16  testimony regarding text messages with Sergeant George Wilson

17  involving both Rafael Guzman and Denny Foster.  The PSR

18  accurately reflects the testimony of Mr. Foster and the

19  inconsistency described in paragraph 45 is not a misstatement

20  of the record at trial.  The objection is overruled.

21          Objection G is an objection to paragraph 47.  Again,

22  paragraph 47 is relevant to the issue of obstruction of

23  justice.  Defendant's general objection is overruled.

24          Objection H is an objection to paragraph 48.  I have

25  reviewed that matter.  The PSR accurately reflects the

testimony of Mr. Foster on direct and cross-examination regarding phone calls after his arrest.  Paragraph 48 is relevant to the issue of obstruction of justice.  The objection is overruled.

Objection I is an objection to paragraph 49. Paragraph 49 is relevant to the issue of obstruction of justice.  Defendant's general objection is overruled.

Objection J is an objection to the implication that Mr. Foster perjured himself at trial.  An objection to a portion of paragraph 40.  And I will resolve that at paragraph 59.

The next subsection in the objections to the presentence report is headed Influence or Impede Co-Defendant's Prosecution.  Objection K is an objection to paragraph 41, first half.  Objection L is an objection to paragraph 41, second half.

I have reviewed that paragraph and the information contained -- I'm sorry.  The information available to me.  I do find that the information contained in paragraph 41 is accurate and that the inference drawn from that information is consistent with the evidence presented at trial.  And I independently draw that same conclusion.  Therefore, defense objection's overruled.

Objection M, Objection to Statement that Mr. Foster Impeded Other Investigations.  With respect to the paragraphs

1   in the presentence report, in particular paragraph 40, I do

2   find that there's sufficient evidence that was presented at

3   trial to conclude that Mr. Foster did appear to have attempted

4   to unlawfully either influence or impede the prosecution of

5   Mr. Guzman for his drug conviction, for which he was facing

6   sentencing of up to seven years, and the prosecution of Denny

7   Foster for his vehicle stop and arrest for possession of

8   marijuana.  And that testimony was that Mr. Foster looked into

9   the circumstances of Denny Foster's arrest, including trying

10   to find out who the CHP officer was.  And it did not appear

11   that that was for legitimate law enforcement purposes.  So the

12   defense objection is overruled.

13        Okay.  Now, with respect to obstruction of justice

14   findings by me.  The United States Sentencing Guidelines

15   Manual, Section 3C1.1, Obstructing or Impeding the

16   Administration of Justice.  Now, the guidelines state:  It is

17   not intended to punish a defendant for the exercise of a

18   constitutional right, including the right to denial of guilt,

19   the right to a jury trial and the right to testify at trial.

20        Hereby providing false testimony under the perjury

21   definition, for perjury to be deemed obstruction of justice,

22   the Court must find that:  One, a defendant gave false

23   testimony.  Two, on a material matter.  And three, with

24   willful intent.  There are a number of cases cited, but one is

25   *United States versus Castro Ponce*, 770 Fed 3d 819 at 822, a

1   Ninth Circuit 2014 case.

2           Now, at trial, Mr. Foster did testify that he did not

3   engage in the conspiracy charged in this case.  And I want to

4   mention a couple of things.  Trial counsel, during opening

5   statement, made a number of statements referring to Mr.

6   Foster's involvement in the preparation of the case for trial.

7   He stated, amongst other things, "Keith is allowing me to

8   stand up here and present the case because he could have stood

9   up here and presented this case."  He also stated, somewhat

10  jokingly, "I want my office back after the case is done."  And

11  he also stated, "He should be up here."  What that indicates

12  is that Mr. Foster was very much involved in the preparation

13  of his case.

14          During the testimony of Mr. Foster, Mr. Foster

15  started out his testimony by stating that he had been waiting

16  two years for me to get the public the truth about this case.

17  And trial counsel asked several times, during the direct

18  examination of Mr. Foster, "Anything else you want to say?"

19  In addition, Mr. Foster did volunteer to add testimony or to

20  correct questions or answers previously given.

21          I mention that to underscore the fact that Mr. Foster

22  was instrumental in developing the defense of his case, the

23  evidence presented to the jury and, most importantly, his own

24  testimony.  Now, in this case, obviously Mr. Foster had to

25  work on developing a defense that would somehow explain his

1   recorded conversations with Rafael Guzman, Denny Foster and

2   others.

3       Now, Mr. Foster previously characterized his trial

4   counsel as skilled trial counsel.  But it was clear to me and

5   on the record that trial counsel would not have mentioned that

6   he was working undercover in his dealings with Rafael Guzman

7   or Denny Foster -- which Mr. Foster at trial characterized as,

8   quote, "absurd" -- without some input from Mr. Foster.

9       Now, regarding a possible defense that Mr. Foster was

10  merely attempting to assist Mr. Guzman and Mr. Denny Foster to

11  become citizen informants, the evidence clearly showed that

12  Mr. Foster's real intent was not as a law enforcement officer

13  attempting to combat drug trafficking.

14      Mr. Foster has known for years that Mr. Guzman was a

15  drug dealer, but only referred Mr. Guzman to narcotics

16  officers when Mr. Guzman told Mr. Foster that he was looking

17  at seven years in prison on a drug case and needed Mr.

18  Foster's personal help and intervention.

19      Mr. Foster had known for years that Denny Foster was

20  a drug dealer.  But only referred Denny Foster to the

21  narcotics officer after Denny was arrested in possession of

22  marijuana and needed Mr. Foster's help.  There were recorded

23  communications between Mr. Foster and narcotics officers as

24  Mr. Foster sought information regarding the arresting officer

25  and the circumstances of Denny's arrest and Mr. Foster's

1   recorded conversations with Desiree Carbajal as he gave her

2   advise and that he told her he was going to call his, quote,

3   "narc guys" and see what we can do.  And if Denny Foster,

4   quote, "would have told me, I would have had some cover for

5   him," end quote.  And soon after that, his recorded calls

6   with Lashon Jones in which he cautioned her to be careful.

7          Now, by Mr. Foster's attempt to explain his

8   communications with Mr. Guzman regarding "the project" that

9   they were working on as being in response to Chief Dyer's

10  assignment to him on heroin drug overdoses.  Chief Dyer

11  explained at trial what he had anticipated that assignment

12  would have entailed, which would have been to contact

13  hospitals, med techs, et cetera, medical personnel.

14         And yet Mr. Foster testified that he turned to Mr.

15  Guzman as his source of information for that assignment; that

16  is, narcotics dealings.  Which had nothing to do with what

17  Chief Dyer clearly had explained his assignment was.  And yet

18  Mr. Foster had to somehow explain what he meant by "the

19  project."  That it was not a drug reference, but rather the

20  thing he was working with with Chief Dyer.

21         Mr. Foster attempted to explain a large amount of

22  cash found in his car and his home as proceeds of a loan by a

23  subordinate officer, that he needed the personal loan because

24  of divorce expenses.  Yet all of the cash that was found in

25  his car and in his safe at home were $100 bills.  Mr. Foster

attempted to explain the loss of 98 Oxycodone tablets by
testifying that he flushed them down the tablet.  As a trained
law enforcement officer, you never get rid of evidence,
especially evidence that would exonerate you to account for an
entire prescription of 100 Oxycodone tablets.

With respect to attempting to refer Denny Foster and
Rafael Guzman as informants, obviously neither one qualified.
Rafael Guzman didn't qualify because of his criminal record.
Denny Foster never signed up.  Obviously they could not be
confidential informants.  But if it was just a matter of Mr.
Foster referring these two individuals to the narcotics
officers for assistance, he could have simply told them no,
they wouldn't be confidential informants, yet they certainly
have some helpful information.  And there was never any
testimony to that effect.

I find the following:  One, that Mr. Foster did give
false testimony as stated in the PSR, paragraphs 40 to 49, the
government's sentencing memorandum page 11 to 13 and my
comments.  They were on a material matter.  Here they went to
the very heart of the charges and the defense, which was a
complete denial of the conspiracy charges.

Three, with willful intent.  Here, his role in the
preparation and presentation of the defense and specifically
Mr. Foster's testimony in particular, his attempts to explain
away evidence against him in support of the charges, support a

1    finding of a willful intent.

2          Therefore, I find that at paragraph 59, the two level

3    adjustment for obstruction of justice under United States

4    Sentencing Guidelines Section 3C1.1 applies.

5          Objection N is an objection to paragraph 59.  That is

6    overruled.

7          Objection O is an objection to the justification

8    statement.  It is overruled based on those findings.

9          The next section is abuse of a position of trust

10   under Section 3B1. -- 3B1.3.  And, again, when I say

11   "section," I'm referring to the United States Sentencing

12   Commission's Sentencing Guidelines.

13         3B1.3, abuse of a position of trust.  There are two

14   issues.  One, whether Mr. Foster occupied a position of public

15   trust.  And in this case, case authority is very clear.  A

16   police officer occupies a position of public trust and the

17   commission of a crime by a police officer constitutes an abuse

18   of that trust.  Amongst other cases, the *United States versus*

19   *Rehal*, R-E-H-A-L, 940 Fed 2d 1 at page 5, a First Circuit 1991

20   case.  *United States versus Foreman*, 926 Fed 2d 792 at 796, a

21   Ninth Circuit 1990 case.

22         Here, at the time of the commission of the offenses,

23   Mr. Foster was the Deputy Chief of the patrol division.

24         The second issue is whether Mr. Foster's abuse of the

25   position of trust either facilitated or concealed the

commission of the crime.  As summarized in the government's
sentencing memorandum at pages 10 and 11, I do find that Mr.
Foster's actions following Denny Foster's arrest on January 4,
2015 were intended to protect Denny Foster and the marijuana
conspiracy.

Objection P.  Objection to paragraph 37, I do find
that there's sufficient evidence in the record to support the
finding of an abuse of a position of trust.  Defense objection
is overruled.

Objection Q.  Objection to paragraph 58.  Therefore,
I do find that at paragraph 58, the two level adjustment for
abuse of position of trust under 3B1.3 applies.  Defense
objection is overruled.

Objection R.  Objection to paragraph 130.  For the
reasons that I previously stated, defendant's objection is
overruled.

Objection S.  Objection to Portion of "Justification"
Statement.  Again, for the reasons previously stated, defense
objection is overruled.

The next section in the defense objections is
"Oxycodone Based Findings As Relevant Conduct."  The United
States Sentencing Commission Guideline Manual, Section 1B1.3,
relevant conduct.

In this case, I have independently reviewed the
evidence contained in the presentence report at paragraphs 27

1  through 35 and the government's summary of the evidence

2  presented at trial in its sentencing memorandum at pages 7

3  through 9.

4  I find that the evidence relating to the Oxycodone

5  charges clearly show that the Oxycodone charges occurred

6  within the same time frame as the heroin and marijuana

7  charges.  That they also involve relatives and close

8  associates of Mr. Foster.  That they were an integral part of

9  the overall investigation of Mr. Foster, including wiretaps

10  and surveillances.  And that the evidence relating to these

11  charges were discovered during the arrest of Mr. Foster in his

12  vehicle and the subsequent search of his residence.

13  Therefore, defense objection is overruled.

14  Objection U.  Objection to paragraph 54.  As to that

15  objection, I have independently found that the Oxycodone in

16  this case constitutes relevant conduct.  As such, it may be

17  properly considered in determining the base offense level.

18  Therefore, the objection is overruled.

19  Objection V.  Objection to portion of paragraph 127.

20  For the reasons I previously stated, defense objection is

21  overruled.

22  And I will address relative culpability in a

23  subsequent section.

24  Objection W.  Objection to portions of justification

25  statement for the reasons that I previously stated, the

1  defense objection is overruled.

2       Now, I will note under the case authority cited by

3  the government in its sentencing memorandum, the Court may

4  consider offenses for which the jury did not arrive at a

5  verdict of conviction.

6       The next section in defense formal objections is the

7  Minimal Role Adjustment under Section 3B1.2(a).  Objection X

8  is an objection to paragraph 36 and 57.  I find in this case

9  that the evidence clearly shows that none of the crimes

10 underlying the conspiracy charges could have been accomplished

11 without the direct significant role of Mr. Foster.  For

12 example, in the marijuana conspiracy, Mr. Foster assured Denny

13 Foster that funds from his source would be available to obtain

14 marijuana.

15      In the heroin conspiracy, Mr. Foster provided the

16 perspective buyer to Rafael Guzman and provided Mr. Guzman

17 access to a prospective buyer.  And as previously discussed,

18 Mr. Foster attempted to provide assistance to Denny Foster

19 after Denny Foster was arrested and to Rafael Guzman on his

20 unrelated drug charge for which he was facing up to seven

21 years in prison.  Therefore, defense objections are overruled.

22      With respect to the total offense level calculations,

23 defense objection Y is an objection to paragraph 60.

24 Defendant objection Z is an objection to paragraph 63.

25 Defense objection AA is an objection to paragraph 109.

1    Defense objection BB is an objection to paragraph 114.

2         Now, for all the reasons that I've previously stated

3    in addressing each of defense objections, I do find the

4    offense level calculations to be correct.  Therefore, defense

5    objections are overruled.

6         And I will cover the specifics with respect to the

7    offense level calculation.  At page 14 of the presentence

8    report, paragraph 54, the base offense level with respect to

9    the calculations, I'll discuss this a little bit more.  But I

10   have reviewed the presentence report and the government's

11   sentencing memorandum.  With respect to the calculations under

12   the drug equivalency table, I do find that the calculations

13   were correct.

14        With respect to a calculation of the 15 pounds of

15   marijuana, the equivalency is 6.80.  With respect to one ounce

16   of heroin, the equivalency is 28.35.  The total is 35.15.

17   With respect to the Oxycodone, the equivalency is 80.40.  The

18   total amount of the marijuana equivalency is 115.55 kilograms.

19   Pursuant to Sentencing Guidelines 2D1.1 and 2D1.1(c)(8), I do

20   find that the base offense level is 24.

21        I also recognize the obligation of the Court in

22   calculating drug equivalencies that I do need to be cautious

23   with respect to calculations.  Here, I find that the drug

24   quantities as set forth in the presentence report and

25   elaborated on by the government clearly set forth sufficient

1 information for me to make the determination of the marijuana

2 equivalency under the drug equivalency table and that the base

3 offense level is 24.

4 Now, with respect to the next section, which is

5 minimal role adjustment at 3B1.2(a). Objection X is an

6 objection to paragraph 36 and 57. I have reviewed the

7 information in this case. All the information that's

8 available. In this case, I do find that the evidence in the

9 case clearly showed that none of the crimes underlying the

10 conspiracy charges could have been accomplished without the

11 direct significant role of Mr. Foster, as I had previously

12 indicated.

13 I find in this case that a minimal role adjustment in

14 the role of the offense does not apply.

15 The paragraph 58, adjustment for abuse of position of

16 trust. I do find, under 3B1.1, it does apply with a two level

17 adjustment.

18 At paragraph 59, adjustment for obstruction of

19 justice under 3C1.1, I do find that that applies for a two

20 level adjustment.

21 Therefore, under paragraph 60, I find the adjusted

22 offense level is 28. There is no acceptance of

23 responsibility. Therefore, under paragraph 63, the total

24 offense level is 28.

25 With respect to the remaining objections by defense,

1    defense objection CC was withdrawn.  We have resolved defense

2    objection DD, EE and FF.

3          With respect to defense objection GG, objection to

4    paragraph 128.  For the reasons I previously stated, the

5    defense objection is overruled.  I do find in this case that

6    the criminal history category is one.  Under the advisory

7    Sentencing Guidelines, as to Count 11, the guideline range is

8    78 to 97 months with a recommendation of 78 months.

9          With respect to Count 12, the guideline range for the

10   reasons already stated, cannot exceed the maximum, therefore

11   it cannot be above 60 months.  And I do find that 60 months

12   under 5G1.1(a) applies.

13         Now, the advisory Sentencing Guidelines are one

14   factor that I have to address.  It is not the sole determining

15   factor.  And in this case, I'm aware of the enhancements in

16   this case.  And the use of Oxycodone as one of the factors in

17   determining the total offense level.

18         So as I realize that the advisory sentencing

19   guidelines is a starting point, it is absolutely essential in

20   a sentencing analysis.  I have completed that.

21         But most significantly are the 3553(a) factors.  And

22   again, the reason that I asked Mr. Foster and supporters to

23   make their comments to the Court before the consideration of

24   the 3553(a) factors is it was important before I consider

25   those to make any conclusions on it, that there be a complete

1  record in support of the various factors, the various

2  mitigating factors which I find to be significant in this

3  case.

4         Now, with respect to the 3553(a) factors, the

5  probation presentence report has gone over those.  I won't

6  repeat them verbatim.  But with respect to the analysis at

7  page 26, 27 and 28, with respect to the nature and the

8  circumstance of the offense, that has been adequately

9  addressed in the presentence report at paragraphs 127 and 128.

10  And I do consider those in terms of the nature and

11  circumstances of the offense.

12         With respect to the history and characteristics of

13  Mr. Foster, I do note the presentence report at paragraph 29

14  addresses those.

15         But in addition -- and I will consider these factors

16  throughout -- is I recognize a number of mitigating factors

17  that are also the history and characteristics of Mr. Foster.

18  They include his educational background.  He has a doctorate.

19  He has far exceeded most people's educational background.  His

20  training in law enforcement, his employment history, his

21  position as the number two person in the Fresno Police

22  Department, his long-term community involvement, his great

23  community support, his family ties and obligations, his

24  possible future service and ongoing service to the community.

25         I have read each of the letters that were provided in

1   support of Mr. Foster.  They were previously submitted in

2   July, but I have reviewed them again.  They were submitted in

3   the prior motion, post-trial motion.  But I had reviewed them

4   also again.  And they are significant.

5         Now, with respect for the seriousness of the offense.

6   Obviously, all drug offenses are serious.  Offenses committed

7   by law enforcement officers, because of the nature of that

8   position, are serious.  In terms of promoting respect for the

9   law, clearly, again, significant where a law enforcement

10   officer is involved.  Provide just punishment for the

11   offense -- and I will get to that in conclusion.  Afford

12   adequate deterrence to criminal conduct.  I have no doubt that

13   it would not apply to Mr. Foster.  I don't see this as

14   deterring future criminal conduct by him.

15         I will note the vast, vast majority of law

16   enforcement officers, almost all of them to a person, are law

17   abiding, committed to public service and the safety of the

18   community that they serve.  There are very, very few law

19   enforcement officers who would consider criminal conduct and

20   criminal conduct that might relate to their profession.

21   Sadly, I did have to sentence another law enforcement

22   individual who had abused that position.  But that's -- just

23   to indicate how rare that circumstance is.

24         But to those very, very small number of individual

25   law enforcement officers who might be out there, who might be

considering any kind of criminal conduct at all, it is important that to the extent that a sentence in this case might serve as a deterrent, that is a factor in this case. I have no doubt that law enforcement officers are viewing this case to see how it resolves.

To protect the public from further crimes of the defendant is certainly not applicable here.

To provide the defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner. In this case, I do note that Mr. Foster has already voluntarily completed a program through the church and has done other programs as required by the Pretrial Services Office. But the one thing that I will make a recommendation is that there be an institution for which Mr. Foster will receive adequate medical care for his medical issues.

With respect to the kinds of sentences available. I have considered the possibility of a split sentence, but given the type of offenses, drug offenses, the enhancement charges of obstruction, abuse of trust, the lack of remorse, I do find that that type of sentence is simply not appropriate in this case.

With respect to the kinds of sentences and the sentencing range set forth in the guidelines, I have considered the relevant factors, I have considered the formal

1   objections, the sentencing memoranda submitted by both sides

2   and the presentence report.  I've also considered the policy

3   statements set forth in the guidelines, including the notes

4   that counsel has referred to and that I've referred to in

5   determining whether or not specific portions or sections or

6   paragraphs of the guidelines apply in this case.

7           Next, the need to avoid unwarranted sentencing

8   disparity amongst the defendants with similar records who have

9   been found guilty of similar conduct.  I have reviewed the

10  sentences imposed upon each co-defendant.

11          And I recognize that every sentencing in every case,

12  even amongst co-defendants, is unique to that particular

13  defendant.  And obviously there are different factors that

14  have already been mentioned, acceptance of responsibility,

15  enhancements, departures, variances, et cetera that may apply

16  in each specific case.  But I will obviously consider

17  sentences imposed in terms of disparity between Mr. Foster and

18  other co-defendants who have pled guilty.

19          With respect to others with similar records or

20  conduct, obviously Mr. Foster's situation, there are very few,

21  fortunately, that I would look to to see what types of

22  sentencing those individuals get.  The need to provide

23  restitution apparently does not apply.  I've already indicated

24  in terms of departure factors or variance factors, employment

25  history, educational background, community involvement,

1  community support, family ties and obligations, possible

2  future service to the community, community support.

3       Now, having considered all of the information in this

4  case, in terms of arriving at a reasonable sentence, I am

5  obviously going to impose a sentence in this case that

6  involves time in custody.  The question, obviously, is what is

7  a reasonable and appropriate sentence.

8       Under the guidelines and under the government's

9  argument, I certainly recognize that 78 months on Count 11 and

10 60 months on Count 12 is justified on the record.  But then

11 taking in 3553(a) factors, that's a separate consideration

12 from the advisory Sentencing Guidelines.  It is a difficult

13 determination.

14      And let me just indicate right now before I impose

15 the sentence, there is sometimes a perception, right, wrong,

16 informed or not, that somehow people with money get off, they

17 get a break.  People in high positions, public or private, get

18 off with a break.  Whatever sentence I impose, obviously, will

19 be subject to debate as to whether or not it was reasonable or

20 unreasonable, whether or not Mr. Foster gets a break or didn't

21 get a break.  Many people will consider whatever sentence I

22 impose to be not a break at all.  Others may consider it to be

23 a break.

24      I don't deal in terms of whether someone gets a break

25 or not.  I deal with basically what's in front of me.  I've

1    already indicated what the presentence -- what the advisory

2    Sentencing Guidelines provide for.  I've already heard from

3    the government with respect to what the government believes to

4    be a reasonable sentence.  I've considered what the defense

5    considers to be a reasonable sentence.

6          In this case, I do find that under the circumstances,

7    all the circumstances -- and the obvious situation here is

8    these are serious offenses, they do warrant a significant

9    amount of time in custody as indicated in the advisory

10    Sentencing Guidelines and the presentence report.

11          But I do have to balance all of the contributions

12    made by Mr. Foster.  And they are substantial and significant.

13    I've also considered the sentencing imposed on other

14    co-defendants, although they are, of course, individualized.

15    And it is a difficult situation, in terms of arriving at what

16    would be a reasonable sentence, taking into consideration all

17    of the factors in this case.

18          But what I am going to conclude in this case is that

19    a reasonable sentence in this case would be a term of 48

20    months on Count 11 and 48 months on Count 12 to be served

21    concurrently.  And that will be the ruling by this Court in

22    terms of sentencing.

23          All right.  Mr. Foster, would you please stand where

24    you're at, please.

25          All right.  Mr. Foster, as I've indicated, I've

1    considered everything.  People may agree or disagree, but it

2    is the ruling by the Court.  And I've tried to set forth

3    everything possible in terms of addressing all the situations.

4            But in this case, pursuant to the Sentencing Reform

5    Act of 1984, it is the judgment of the Court that you're

6    hereby committed to the custody of the Bureau of Prisons to be

7    imprisoned for a term of 48 months on Count 11, 48 months on

8    Count 12 to be served concurrently for a total term of 78

9    month -- I'm sorry, 48 months.

10           You shall pay a special assessment of $200, payment

11   to begin immediately.  I find that you do not have the ability

12   to pay a fine, imposition of fine is waived.

13           Upon release from imprisonment, you shall be placed

14   on supervised release for a term of 36 months on Count 11 and

15   36 months on Count 12 to be served concurrently for a total

16   term of 36 months.

17           Within 72 hours of your release from the custody of

18   the Bureau of Prisons, you shall report in person to the

19   probation office in the district to which you are released.

20           While on supervised release, you shall not commit

21   another federal, state or local crime.  You shall not possess

22   a firearm, ammunition, a destructive device or any other

23   dangerous weapon.  You shall not illegally possess controlled

24   substances.  You shall cooperate in the collection of DNA as

25   directed by the probation officer and you shall comply with

the standard conditions which have been recommended by the
United States Sentencing Commission and adopted by this Court.

You shall refrain from any unlawful use of controlled
substance.  You shall submit to one drug test within 15 days
of your release from imprisonment and at least two periodic
drug tests thereafter, not to exceed four drug tests per
month.

You shall also comply with the following special
conditions:  One, you shall submit to the search of your
person, property, home and vehicle by a United States
Probation Officer or any other authorized person under the
immediate and personal supervision of the probation officer
based upon a reasonable suspicion without a search warrant.
Failure to submit to search may be grounds for revocation.
You shall warn any other residents that the premises may be
subject to searches pursuant to this condition.

Two, you shall provide the probation office with
access to any requested financial information.

Three, you shall not possess or have access to any
cellular phone without the advance permission of the probation
officer.  You shall provide all billing records for such
device whether used for business or personal, to the probation
officer upon request.

Four, you shall register as required in the
jurisdiction in which you reside as a drug offender.

1          Five, as directed by the probation officer, you shall

2     complete up to 20 hours of unpaid community service per week

3     until you are employed for at least 30 hours per week or you

4     are participating in a previously approved educational or

5     vocational program.

6          I will recommend that you be incarcerated at an

7     institution in California, specifically placement at FCI

8     Dublin to facilitate regular family visitation.  In the

9     alternative, I will recommend placement at FCI Lompoc to

10    facilitate visitation.  I will also recommend that you be

11    incarcerated at an institution that will adequately address

12    medical care and medical needs.

13         All right.  Mr. Foster, do you understand the

14    sentence imposed by the Court in your case?

15         THE DEFENDANT:  Yes.

16         THE COURT:  Now, you do have the right to appeal.  If

17    you desire to appeal, you must file your notice of appeal in

18    writing with the Court within 14 days of today's date.  If you

19    cannot afford an attorney for your appeal, the Court will

20    appoint one for you.  Do you understand that?

21         THE DEFENDANT:  Yes.

22         THE COURT:  All right.  Now, I am going to grant

23    voluntary surrender.

24         MR. McKNEELY:  Your Honor, would the Court consider

25    extending the date for 60 days to January 13?

1          THE COURT:  Let's see.  Government response?

2          MS. ALSWORTH:  No objection.

3          THE COURT:  Very well.  All right.  It is further

4  ordered that having been sentenced to the custody of the

5  Bureau of Prisons, you shall surrender to the institution

6  designated by the Bureau of Prisons or, if no such institution

7  has been designated, you're to turn yourself into the United

8  States Marshal here in Fresno, California before two p.m. on

9  January 13th, 2018.

10          You are further advised it is a criminal offense

11  punishable by a consecutive term of imprisonment to fail to

12  surrender for service of sentence pursuant to the order of

13  this Court.  All conditions of pretrial release shall remain

14  in effect until you surrender in accordance with this order.

15  Do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  All right.  Anything further on behalf of

18  defense?

19          MR. McKNEELY:  No, Your Honor.

20          THE COURT:  Anything further on behalf of government?

21          MS. ALSWORTH:  The government moves to dismiss the

22  remaining counts.

23          THE COURT:  That motion is granted.  Anything further

24  by either parties at this time?

25          MR. McKNEELY:  No, Your Honor.  Thank you.

1          THE COURT:  Court will be in recess.

2      (The proceedings were concluded at 12:32 p.m.)

3

4          I, KAREN HOOVEN, Official Reporter, do hereby certify

5    that the foregoing transcript as true and correct.

6

7    DATED:  28th of December, 2017      /s/  Karen Hooven____

8                                        KAREN HOOVEN, RMR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25